IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

MICHAEL JAY THOMAS,      )
                         )
         Plaintiff,      )
                         )
        v.              )     Case No.
                         )     13-1185-CV-W-REL-SSA
CAROLYN W. COLVIN, Acting    )
Commissioner of Social Security,    )
                         )
        Defendant.    )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Michael Thomas seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) assessing plaintiff's residual functional capacity, (2) relying on improper vocational expert testimony, and (3) finding plaintiff's subjective complaints not credible. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.   BACKGROUND

On January 14, 2011, plaintiff applied for disability benefits alleging that he had been disabled since January 1, 2008, later amended to June 1, 2008. Plaintiff's disability stems from uncontrolled hypertension, sleep apnea, seizures, separated shoulders bilaterally with muscle cramping and spasms, arthritis, and cramps and spasms in his knees. Plaintiff's application was denied on March 28, 2011. On September 10, 2012, a hearing was held before an Administrative Law Judge. On October 12, 2012, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On October 9, 2013, the Appeals Council denied plaintiff's

request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

3

5.     Does the impairment prevent the claimant from doing any other work?

    Yes = disabled.
    No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Janice Hastert, in addition to documentary evidence admitted at the hearing.

## A. ADMINISTRATIVE REPORTS

The record reflects that plaintiff did not return his activities of daily living forms (Tr. at 350).  The record contains the following administrative reports:

## Earnings Record

The record shows that plaintiff earned the following income from 1981 through 2011:

| Year | Earnings | Year | Earnings |
|------|---------|------|---------|
| 1981 | $ 1,340.00 | 1997 | $ 2,388.78 |
| 1982 | 0.00 | 1998 | 8,307.13 |
| 1983 | 3,407.33 | 1999 | 2,700.75 |
| 1984 | 0.00 | 2000 | 10,723.58 |
| 1985 | 4,564.48 | 2001 | 11,384.18 |
| 1986 | 2,450.54 | 2002 | 4,131.69 |
| 1987 | 9,032.48 | 2003 | 12,174.86 |
| 1988 | 12,316.88 | 2004 | 14,626.13 |
| 1989 | 377.00 | 2005 | 8,201.17 |
| 1990 | 3,424.74 | 2006 | 12,129.86 |
| 1991 | 1,425.39 | 2007 | 3,938.38 |
| 1992 | 4,550.26 | 2008 | 2,116.78 |
| 1993 | 4,361.16 | 2009 | 0.00 |

4

| 1994 | 7,689.74 | 2010 | 0.00 |
| 1995 | 6,708.18 | 2011 | 0.00 |
| 1996 | 0.00 | | |

(Tr. at 181).

During his last few years of employment, plaintiff had multiple employers (Tr. at 188-191). In 2008 he worked for Monterey Park Nursing Center ($663.01) and Independence 1, Inc. ($1,453.77). In 2007 he worked for Ace Personnel, Inc. ($200.00), Alphastaff Group, Inc. ($1,465.22), and Beverly Health and Rehabilitation ($2,273.16). In 2006 he worked for Crown Services, Inc. ($168.66) and Beverly Health and Rehabilitation ($11,961.20). In 2005 he worked for Beautiful Savior Home ($1,279.29), Community Access ($1,744.60), and Beverly Health and Rehabilitation ($5,177.28). In 2004 he worked for Beautiful Savior Home ($372.15), and NHS Leasing and Consulting ($14,253.98). In 2003 he worked for Holden Manor, Inc. ($1,745.18) and NHS Leasing and Consulting ($10,429.79). In 2002 he worked for Phelps Enterprises, Inc. ($598.50), K-MAC Enterprises ($1,397.45), DSLM, Inc. ($2,112.64) and Northport Health Services ($23.10). In 2001 he worked for Jason Gower ($560.00), Labor Connections, Inc. ($168.00), Unity School of Christianity ($3,719.23), DSLM, Inc. ($3,389.16), and Pavestone Company ($3,547.79). In 2000 he worked for Texas Hydraulics ($2,736.12), Allen Transfer & Storage Co., Inc. ($4,358.44), and Contemporary Products of Texas, Inc. ($3,629.02).

**Disability Report - Field Office**

On February 28, 2011, interviewer V. Anthony had a face-to-face meeting with plaintiff regarding his application for disability benefits (Tr. at 204-207). The interviewer observed that plaintiff had no difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using his

5

hands or writing. He was described as a "very nice person, his appearance is okay, he was having [a] cramp in his leg."

**Function Report - Adult**

In a Function Report dated March 5, 2011, plaintiff described his day as follows: "I help my wife get the children ready for school and then drive my wife and kids to school and work. When I get back I have to sleep because I don't sleep well at night. I try to do some housework but it is hard to do standing and bending. Then I just wait till I have to pick everyone up from work and school. I help wife with dinner and help put children to bed." (Tr. at 240-247). He cooks and cleans and helps take care of his wife and kids. He has a dog; he feeds the dog and takes him outside. Plaintiff has sleep apnea and falls asleep "real easy." He has no problem dressing, bathing, caring for his hair, shaving, feeding himself or any other aspect of personal care. Plaintiff and his wife cook together daily. His cooking habits have not changed as a result of his impairments. He is able to do some light cleaning, dishes, vacuuming, light laundry. He tries to do a little cleaning every day. It takes him several hours because he has to stop and rest. He goes outside every day, he drives and rides in cars, and he is able to go out alone. He shops in stores twice a week for 30 minutes to an hour each time. Plaintiff loves to read but he falls asleep when he reads and watches television. He spends time playing cards or board games with his wife and children. He goes to his wife's family's home for regular family gatherings, but he usually sits in a corner and sleeps.

Plaintiff's condition affects his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate, and use his hands. All of these things are a problem because his muscles cramp when he does these things. He does not have difficulty talking, hearing, understanding, following instructions or getting along with others.

6

Plaintiff can walk about a block before needing to rest for 5 or 10 minutes. He can pay attention for 2 minutes at a time. He does not finish what he starts. He is able to follow written instructions well but he has difficulty with spoken instructions. He concluded with the following:

> I just want to say that before this all started happening I was very active in sports and worked every day I was scheduled to. Now my blood pressure is so out of control even with meds that the doctors are afraid that it is going to affect my whole body. My sleep apnea is so bad we had to put our daughter in day care because I can't stay awake to care for her. My wife does work and takes care of me and the children and it upsets me that I cannot take some of the stress and pressure she has because basically she does it alone. If anything this is the only way I can help my family and myself.

**Missouri Supplemental Questionnaire**

In a Missouri Supplemental Questionnaire dated March 5, 2011, plaintiff reported that he plays video games or puzzles or uses a computer for 15 minutes at the most (Tr. at 249-251). He has a driver's license and is able to drive a car.

**Disability Report Appeal**

In a Disability Report - Appeal dated April 26, 2011, plaintiff reported that his whole-body muscle cramps have gotten so bad that he can no longer straighten up for more than a few minutes (Tr. at 254-258). This began in 2011. Plaintiff's medications at the time consisted of Norvasc and Toprol XL, both for hypertension. Even though in his Function Report dated March 5, 2011 (less than two months earlier) plaintiff had reported no difficulty at all with personal care, in this form he reported that his wife has to shave him and cut his hair because of his arm cramps. "She helps me in and out of the shower. I lean in the shower to wash myself. I have a difficult time putting on pants. I have to pull them up my legs then lay flat on the back to pull them up and then slide down to get them up. I usually wear sweat pants and pull over shorts. I can't button shirts. [It is] difficult to use my fingers."

7

B.    *SUMMARY OF MEDICAL RECORDS*

June 1, 2008, is plaintiff's alleged onset date.

On June 24, 2008, plaintiff went to Truman Medical Center after his blood pressure had measured 190/137 during a physical at work (Tr. at 322-345, 467-472, 478-485). Plaintiff had only been taking one of his four high blood pressure medications, indicating he could not afford them. Plaintiff complained of right sided chest and shoulder tightness for the past couple of days. He denied any trauma to his shoulder but said he has had chronic pain in his right shoulder and an MRI had shown tendon tears in the past. Plaintiff reported blurred vision for the past six months but had not had an eye exam during that time and said his vision was blurry all the time lately. Plaintiff also complained of headaches for the past six months which improve with ibuprofen and Motrin. Plaintiff reported daytime fatigue and falling asleep during conversations, nighttime snoring and episodes of apnea. He had been having some numbness in his left middle finger and both legs. Plaintiff had quit smoking in 1998 after smoking for 20 years. He denied alcohol use. He reported having used marijuana two weeks earlier. Plaintiff's physical exam was normal except his blood pressure. He had normal muscle strength and tone and 5/5 strength in all extremities. A CT scan of plaintiff's head was ordered due to complaints of headaches; it was normal (Tr. at 334). Chest x-rays were normal (Tr. at 336).

Douglas Geehan, M.D., a general surgeon, evaluated plaintiff for a biopsy due to complaints of muscle cramps in all muscles of his body for the past 4 to 5 years. Plaintiff stated that the cramps are worse with exertion as minimal as doing laundry. He also experienced feelings of malaise and generalized weakness." Plaintiff was noted to be "uncooperative to exam" (Tr. at 327, 471).

Case 4:13-cv-01185-REL   Document 13   Filed 03/03/15   Page 8 of 54

Plaintiff had three sets of cardiac enzymes in the hospital which were negative without any EKG changes. "His blood pressure gradually improved with starting his home medications. The patient had been out of his medications for 6 months. The patient was given refill on all his medications and was encouraged to follow up in medicine clinic." Plaintiff was encouraged to follow up as an outpatient for a biopsy to determine whether he has myositis.[1] He had previously seen a neurologist and a biopsy was recommended then, but he never scheduled one.

Plaintiff was discharged the following day, activity as tolerated, with the following diagnoses:

1.      Hypertensive urgency secondary to noncompliance. He was restarted on lisinopril, norvasc, hydrochlorothiazide, and Toprol XL.

2.      Chronic headaches, likely tension.

3.      Questionable myositis

4.      Hypertension

On October 15, 2008, plaintiff was seen at Truman Medical Center for a follow up and complaining of muscle spasms (Tr. at 448-451). "I have been out of my meds for one month." Plaintiff denied chest pain, dizziness, or headaches. His blood pressure was 189/131, was rechecked and was 216/151. He said he had been out of his medication due to lack of affordability. "Pt was hospitalized in June for hypertensive urgency secondary to lack of medicines for 6 months, which was causing him chest tightness and severe headache. Cardiac enzymes at that time were negative x 3, EKG was within normal limits, CK[2] was elevated

_____

[1]Myositis is a rare disease in which the muscle fibers and skin are inflamed and damaged, resulting in muscle weakness.

[2]Creatine kinase is an enzyme chiefly found in the brain, skeletal muscles, and heart. An elevated level of creatine kinase is seen in heart attacks, when the heart muscle is damaged, or

without determined cause. His BP was controlled when he was discharged." Plaintiff complained that all the muscles in his body tense up for 3 or 4 hours after physical activity. "This had started after he had gone to the hospital and 'they had told him he had heat stroke.'" He rated the pain as "over 10" on a scale of 1/10 and nothing relieved it. Plaintiff also complained of chronic shoulder pain that started after his heat stroke, and he rated that pain as a 7/10. Plaintiff reported using marijuana. He said he stopped smoking cigarettes 10 years ago. Plaintiff could abduct to 90 degrees, his strength was 4/5.



Plaintiff was assessed with severely uncontrolled hypertension but was asymptomatic. "Will refill medications with change to medications covered under Truman Medical Center discount." He was given his medications with "11 refills on al so patient will not be out of medication." He was assessed with myositis, etiology unknown. EMG[3] study was normal. "Pt did not have muscle biopsy completed." Shoulder x-rays were ordered. He was told to return in one month after his blood work and x-rays had been completed.

On November 12, 2008, plaintiff was seen at Truman Medical Center for a follow up on hypertension and complaints of bilateral shoulder pain (Tr at 473-477, 486-489). He weighed 277.3 pounds and his blood pressure was 155/101. He denied chest pain, headache or blurred vision. "Patient has been up to date with current medications and has been asymptomatic since last clinic visit." Plaintiff complained of muscle spasm episodes during

in conditions that produce damage to the skeletal muscles or brain.

[3]Electromyography (EMG) is a diagnostic procedure to assess the health of muscles and the nerve cells that control them (motor neurons).

which all muscles in his body tense up after physical activity. "Pt says that he has seen neurology once but I am unable to find any neurology notes, and pt says that he was unable to get a muscle biopsy due to financial constraints that was ordered in the past. Pt says that this has been problematic because it makes him unable to work and has adverse effects on his family life." Plaintiff reported that he quit smoking cigarettes 10 years ago and quit using marijuana 6 months ago. Plaintiff had decreased range of motion in his shoulders secondary to pain. "Pt says that he is not weak but he is in pain." Strength in upper extremities was 3/5, in lower extremities was 5/5. He was assessed with uncontrolled hypertension but asymptomatic, "myositis/muscle spasms?" etiology unknown, and shoulder pain with normal shoulder x-rays. Plaintiff was told to take Tylenol as needed for shoulder pain, and he was given a referral for an MRI and physical therapy.

On December 24, 2008, plaintiff was seen at Truman Medical Center for a follow up on shoulder pain and hypertension (Tr. at 456-461). "He also noted that he has been unable to get his medications due to the change in the discount list at Truman Medical Center and has only been taking his Toprol. He is asymptomatic at this time, denies blurry vision and headache." Plaintiff reported worsening shoulder pain, "unable to be seen by physical therapy because of time conflicts." Plaintiff denied headache and blurred vision. He reported that he had quit smoking cigarettes and marijuana. His upper extremity strength was 3/5, lower extremity strength was normal at 5/5. He could abduct his arm to 75 degrees. "Emphasized importance of conservative management including starting physical therapy before referral to orthopedics. Continue Tylenol as needed." MRI of the left shoulder showed partial tear and degenerative changes. MRI of the right shoulder showed partial tear. He was assessed with uncontrolled hypertension, with blood pressure this day of 192/124 although he was asymptomatic. He was prescribed Norvasc, Accupril, and Toprol XL. He was referred to a

11

sleep clinic due to a previous diagnosis of obstructive sleep apnea. "Advised diet changes and weight loss to help with overall health and possible decreasing risk of type 2 diabetes mellitus."

On May 13, 2009, plaintiff saw Amr Edrees, M.D., a rheumatologist, at Truman Medical Center with complaints of bilateral shoulder pain (Tr. at 443-447). Plaintiff reported the pain for the past four years and said it worsens with elevation of his shoulders. "He has no . . . chest pain, no shortness of breath, no loss of weight. He has no weakness in his lower extremities." His blood pressure was 168/109. Plaintiff's shoulder abduction was 80 degrees. He had tenderness around the subacromial bursa. His lower extremities had normal muscle power.



Dr. Edrees reviewed plaintiff's MRI from 2008 which showed partial rotator cuff tear. He assessed bilateral shoulder pain with partial tear of the rotator cuff. "[P]atient will need to start on physical therapy to prevent frozen shoulder, and he was previously referred to physical therapy in the medicine clinic. He has tear in his rotator cuff muscle, and I referred him today to the orthopedic surgery to assess possible need for surgery in his rotator cuff tear." Dr. Edrees noted plaintiff's history of elevated creatine kinase and muscle enzymes. "His condition does not suggest the diagnosis of polymyositis,[4] and he has persistent elevation of his CK without weakness in his lower extremities. His shoulder movement is mainly limited because of his rotator cuff problem. His previous lab showed negative ANA, negative anti-Jo-1, and it is possible that his CK elevation

---

[4]"Polymyositis is an uncommon inflammatory disease that causes muscle weakness affecting both sides of your body. Polymyositis can make it difficult to climb stairs, rise from a seated position, lift objects or reach overhead. . . . While there is no cure for polymyositis, treatment -- ranging from medications to physical therapy -- can improve your muscle strength and function." http://www.mayoclinic.org/diseases-conditions/polymyositis/basics/definition/con-2002071 0

could be related to his rotator cuff tear.  We will evaluate his condition, and we will refer him for EMG study to see if he has evidence of myositis in his EMG pattern."  He was advised to follow up with his primary care physician for control of his blood pressure.

On June 11, 2009, plaintiff was seen in the orthopedic clinic at Truman Medical Center with complaints of bilateral shoulder pain (Tr. at 462-466).  "The patient does report that he went to physical therapy, per his primary care manager's instructions, but he was only able to attempt two times due to the excruciating pain."  Plaintiff admitted to marijuana use.  His blood pressure was 172/120.  He weighed 278 pounds.  He was able to forward flex to 60 degrees and externally rotate 20 degrees (see diagram on page 10).  His strength was 4/5.  X-rays of the left shoulder and cervical spine were obtained and were normal.  "It is explained extensively to Mr. Thomas that it is going to hurt when he does his physical therapy, but if he does not go through with it that most likely he will either keep this range of motion or it will become progressively worse and the pain will not get any better."  A new prescription for physical therapy for twice a week for six weeks was given to plaintiff.  He was prescribed Arthrotec (non-steroidal anti-inflammatory) and was given a few Ultracet (narcotic-like pain reliever) as needed for pain, dispensed 20 to use for physical therapy so he could tolerate it.  Plaintiff was told to return in three weeks and if his pain was not better, they would discuss the possibility of a steroid injection.  Plaintiff was instructed to go directly to his medicine clinic and made an appointment to be evaluated for his high blood pressure.

There are no medical records for the next year.

On June 29, 2010, plaintiff saw a nurse practitioner at Truman Medical Center (Tr at 452-453).  His blood pressure was 210/154.  He was smoking marijuana twice a day.  "Patient states he is out of blood pressure medications and needs a refill, he was last seen over one year ago, his BP today is uncontrolled at 210/154.  He denies any chest pain, shortness of

air, headaches, slurring of speech or change in gait or mentation. Repeat blood pressure is 203/154, patient denies any symptoms or problems." His physical exam was normal. He was assessed with benign essential hypertension. He was prescribed Accupril, Norvasc and Toprol XL from the Truman discount list. "Patient instructed to take his medications today and tomorrow morning and return to clinic tomorrow for blood pressure check."

On June 30, 2010, plaintiff saw a nurse practitioner at Truman Medical Center (Tr. at 438-440). His blood pressure was 210/154 at 8:21 a.m., 226/154 at 8:36 a.m., 200/135 at 8:51 a.m. "Patient was seen yesterday for BP medications refills. His BP yesterday was 210/154; he adamantly refused to go to ED [emergency department]. He was instructed to increase Toprol XL to 200 mg last night and this morning, and restart [his other medications]. He was to f/u this morning. This morning he arrives with BP 226/154; after 5 min. his BP was taken and was 200/134, he denies any chest pain, shortness of air, headaches, slurring of speech or change in gait or mentation. He denies other acute problems." Plaintiff continued using marijuana. His physical exam was normal. He was assessed with benign essential hypertension, unspecified myopathy, and obesity. Plaintiff was given Clonidine during the clinic visit and rested for 60-90 minutes. After that, his blood pressure was 186/126. Plaintiff was counseled at length about increasing his physical activity, including aerobic activity. He was told to control his diet and lose weight. He was sent home to continue with his blood pressure medications. "Unfortunately pt was to receive script of Clonidine to take BID [twice a day] however he was released without getting this script. Will add Clonodine 0.2 mg BID to regimen with instructions to follow up in one week."

On July 1, 2010, plaintiff saw a nurse practitioner at Truman Medical Center (Tr. at 430-431). He reported that he was using marijuana twice a day. "Patient has been seen the past two days for elevated blood pressure. BP was 210/154; 200/135 and today 214/148, he

14

adamantly refuses to go to the ER.  He was instructed to increase Toprol XL to 200 mg last night and this morning, and restart Accupril 40 mg oral tablet and Norvasc 10 mg.  He was to f/u this morning.  He denies any chest pain, shortness of air, headaches, slurring of speech or change in gait or mentation.  Patient states he is taking all of his medications as prescribed.  He will not stay today and have repeat BP taken."  Plaintiff was giving clonidine while in the clinic and would not stay, saying, "I have too many things to do today" to have the repeat blood pressure done.  He was told to continue taking his medications, and HCTZ (hydrochlorothiazide, for high blood pressure) every other day and Clonidine twice a day were added to his medication regimen.  He was told to return the next day for blood pressure check. Signs and symptoms of heart attack and stroke were reviewed with plaintiff.

On July 14, 2010, plaintiff was seen by a nurse practitioner at Truman Medical Center for a callus on his right foot (Tr. at 408-410).  His blood pressure was 194/129 at 11:35.  He was given blood pressure medication and his blood pressure was 162/115 at 1:11 p.m. Plaintiff denied headache but reported a history of chronic headaches.  He had used marijuana two weeks earlier.  He denied chest pain, shortness of breath, back pain or joint pain.  "Advised to take all BP medications and follow up in 3-4 days with me or see your PCP ASAP. . . . Discussed about his diet and exercise which are very noncompliant.  Educated him [on] the importance of taking medication and life style modification massively about 15 minutes."

On August 2, 2010, plaintiff was seen in the orthopedic clinic at Truman Medical Center for complaints of bilateral shoulder pain (Tr. at 454-455).  He reported that his shoulder pain had been present for more than 4 years.  "Denied any known injury, claims he just woke up early morning with the pain.  He was diagnosed at that time with bilateral

adhesive capsulitis[5] of the shoulders. It was recommended that he attend physical therapy 2 times a week for 6 weeks and come back to clinic for re-evaluation. The patient states that he went to one physical therapy session, thought that the cost was too high at 15 dollars per visit and subsequently never returned, has not followed up in the orthopedic clinic until today. He states that there has not been really any change in his symptoms or his range of motion or functionability." Plaintiff's blood pressure was 162/110. "It was discussed with Mr. Thomas that the only thing that we really had [to] offer at this time is for him to attend physical therapy and that without that his range of motion and discomfort will progressively become worse." Plaintiff was sent to the emergency department due to his elevated blood pressure.

On August 23, 2010, plaintiff saw Ashcaf Gohar, M.D., for an evaluation of sleep apnea (Tr. at 441-442). Plaintiff reported snoring, stopping breathing during sleep, daytime drowsiness, and falling asleep during the day watching television. Plaintiff reported occasionally seeing hallucinations before falling asleep. When reviewing his medications with Dr. Gohar, plaintiff stated that he had been out of his hypertension medication for a week. "He is a smoker, used to smoke from age 15 to age 30, two packs per day and quit smoking since then but he still smokes marijuana." Plaintiff reported that he could walk a mile but then he would feel short of breath. He can climb a flight of stairs but also feels short of breath. "Does not have any chest pain, weakness, tingling, numbness, or vision problem today despite very high blood pressure." Plaintiff's blood pressure was 216/147 but he was described as

---

[5]"Frozen shoulder, also known as adhesive capsulitis, is a condition characterized by stiffness and pain in your shoulder joint. Signs and symptoms typically begin gradually, worsen over time and then resolve, usually within one or two years. . . . Treatment for frozen shoulder involves stretching exercises and, sometimes, the injection of corticosteroids and numbing medications into the joint capsule. In a small percentage of cases, surgery may be needed to loosen the joint capsule so that it can move more freely."
http://www.mayoclinic.org/diseases-conditions/frozen-shoulder/basics/definition/con-2002251

asymptomatic. He weighed 259 pounds. Strength in arms and legs was normal at 5/5. A sleep study was recommended, he was told to lose weight through diet and exercise, pulmonary function tests were recommended, "counseled about quitting smoking [marijuana] and explained the side effects on the lung, which is even worse than smoking cigarettes." He was told to follow up three months after his sleep study.

On September 5, 2010, plaintiff was seen in the emergency room at Truman Medical Center with complaints of feeling "out of it" which he related to his uncontrolled diabetes (Tr. at 388-401, 411-424). He described dizziness and lightheadedness, right arm weakness which had resolved, and shortness of breath. He said he had dropped a cup that morning due to weakness. He denied any numbness, tingling or lower extremity edema. Plaintiff complained of blurry vision, a headache, and a "funny feeling" in his arm. His blood pressure was 202/131 (Tr. at 412). Plaintiff told the triage nurse that he had been taking his blood pressure medication as directed; however, he told Dr. Barksdale that he had not been taking his medication (Tr. at 411). "The patient has been out of his blood pressure medications for 3 weeks. When asked why, he said he cannot see his doctor until October 8, 2010," more than a month away. Plaintiff reported continuing to use marijuana and he tested positive for marijuana (Tr. at 401). His blood sugar was high was 162 (normal is below 108) (Tr. at 423). He had 5/5 muscle strength in both arms and legs with normal range of motion. "Of note, the patient is unable to lift his shoulders as he has chronic rotator cuff issues." A head CT scan was normal. Chest x-rays were normal. Plaintiff was given IV blood pressure medication and doses of his prescribed blood pressure medication. His systolic blood pressure decreased from the 200s to the 180s. Plaintiff was restarted on his blood pressure medications. He was scheduled for an echocardiogram to rule out cardiac causes, and a bilateral renal arterial

Case 4:13-cv-01185-REL   Document 13   Filed 03/03/15   Page 17 of 54

Doppler was recommended. An MRI of his head was scheduled to rule out ischemic CVA[6] and plaintiff was started on a daily aspirin. He was assessed with obstructive sleep apnea. "Unknown CPAP settings. The patient needs to follow up with outpatient sleep study according to last note from the sleep clinic." Plaintiff was assessed with noncompliance. "The patient has been out of his medications and stated that he cannot get into the clinic until October. There is no documentation of the patient's attempt to get refills over the phone. Was here in the emergency department on August 23, 2010 and left AMA [against medical advice] at that time." He was assessed with morbid obesity. "Might be contributing [to] the patient's obstructive sleep apnea as well as other medical problems. Advised the patient this is a risk factor and recommended increasing exercise and diet modification." Plaintiff was admitted to the hospital.

MRI of head and neck (carotid artery) were normal. Echocardiogram showed an ejection fraction of 45%.[7] Arterial Doppler showed no significant stenoses (narrowing) (Tr. at 395). Plaintiff was discharged on September 7, 2010, at which time he stated that all of his symptoms were completely resolved (Tr. at 393). He was instructed on the importance of medical compliance and appropriate follow up. He was given all medications with refills. He

---

[6]Ischemic stroke occurs when a blood clot blocks or plugs an artery leading to the brain.

[7]"Ejection fraction is a measurement of the percentage of blood leaving your heart each time it contracts. During each heartbeat cycle, the heart contracts and relaxes. When your heart contracts, it ejects blood from the two pumping chambers (ventricles). When your heart relaxes, the ventricles refill with blood. No matter how forceful the contraction, it doesn't empty all of the blood out of a ventricle. The term 'ejection fraction' refers to the percentage of blood that's pumped out of a filled ventricle with each heartbeat. The left ventricle is the heart's main pumping chamber, so ejection fraction is usually measured only in the left ventricle (LV). An LV ejection fraction of 55 percent or higher is considered normal. An LV ejection fraction of 50 percent or lower is considered reduced. Experts vary in their opinion about an ejection fraction between 50 and 55 percent, and some would consider this a 'borderline' range."
http://www.mayoclinic.org/ejection-fraction/expert-answers/faq-20058286

was told to follow up in the clinic in two weeks for evaluation of blood pressure and medical compliance and to follow up with cardiology in one month.

On September 15, 2010, plaintiff had a sleep study (Tr. at 359-373). Plaintiff was 5'10" tall and weighed 259 pounds (Tr. at 362). During the sleep study, a CPAP was put in place at 1:35 a.m. The following morning, plaintiff reported that his quality of sleep had been better than normal and that in the morning he felt more alert than normal. Plaintiff was assessed with severe obstructive sleep apnea. With a CPAP set at 10 cm water, his symptoms were relieved. He was also assessed with obesity. "Weight management is recommended."

On November 19, 2010, plaintiff had a pulmonary function test performed at Truman Medical Center (Tr. at 433-435). He weighed 262 pounds. The results were "abnormal, suggestive of an upper airway abnormality. If clinically warranted, suggest additional studies to clarify the nature of the abnormality."

On November 20, 2010, plaintiff was seen in the sleep clinic at Truman Medical Center (Tr. at 436-437). "We sent him for a sleep study, that was done on September 15, 2010, and had severe obstructive sleep apnea . . . . We ordered CPAP of 10 cm water, and the company contacted him, but he could not afford the payment of 75 dollars per month, and he did not get his machine." Plaintiff reported that he smoked 2 packs of cigarettes per day from age 15 to 30 and then quit and started smoking marijuana. He reported occasional shortness of breath with exertion. His blood pressure was 158/108. He reported that he always has uncontrolled blood pressure but is asymptomatic. "We will ask our coordinator to try to get him a cheaper price for the machine because he needs the machine very bad. Instructed to avoid driving if he feels sleepy." His pulmonary function test was described as normal so his shortness of breath "most likely is from deconditioning and uncontrolled hypertension." He was counseled on weight loss with diet and exercise. He was counseling on quitting marijuana use.

19

On February 16, 2011, plaintiff was seen in the orthopedic clinic at Truman Medical Center for a follow up on bilateral shoulder, knee and ankle pain; chronic myalgias and cramping; and medication refills (Tr. at 425-429). Plaintiff said he had been seen in Ortho for these symptoms in the past and was told to participate in physical therapy. "However, he states he has not been able to get the physical therapy due to costs. Also, he states that he has always had bilateral knee and ankle pain. He has received trauma to both knees and ankles as a semi pro football player and when he was involved in a 5 ton car crash when he was part of the USMC." He reported worsening pain over the past year. He described his pain as a 7/10 and frequently goes to a 9/10. "He states that he can't pass any physical for employment due to his knee pain." He reported that his chronic myalgias and cramping had been stable. Plaintiff had had extensive workup for his myalgias and cramping and was frustrated because he had not gotten any diagnosis. Plaintiff reported continued use of marijuana. His blood pressure was 157/100, although he was noted to be "completely asymptomatic from hypertention" (Tr. at 429). His shoulder range of motion was diminished due to pain. Ankle and knee range of motion was diminished due to pain. Plaintiff was assessed with uncontrolled hypertension. His medications were refilled and his Toprol XL dosage was doubled. Blood work was ordered, and a renal ultrasound was recommended. His Ultracet was refilled for knee pain and x-rays of the knees and ankles were ordered. He was referred to rheumatology for his myalgia and muscle spasms. He was referred to orthopedics for his shoulder pain and "stressed importance of physical therapy." He was assessed with severe obstructive sleep apnea. Plaintiff said he had not been using his CPAP machine due to cost, and the sleep clinic notes indicate they are working with the manufacturers to decrease the cost for him. "Stressed importance of using his CPAP machine. . . . Has follow up appointment with sleep clinic in 3/11. Stressed importance of keeping appointment and to do everything possible to fund the CPAP machine."

The notes state that "lack of treatment of obstructive sleep apnea is no doubt a contributing factor" to his uncontrolled hypertension (Tr. at 429). He was also assessed with marijuana dependence. "Stressed importance of quitting marijuana."

On February 23, 2011, plaintiff was seen at Truman Medical Center for a follow up on hypertension (Tr. at 403-407). "Last week, Mr. Thomas was in our clinic. His BP was 157/100. He was started on Acuretic along with Norvasc and Toprol XL for BP control. He states that he has been taking all his medications as prescribed, except for Norvasc earlier this morning because he ran out. He states he measures his BP at home but does not record it. He also avoids all salt in his diet. Other than that he has no complaints." He denied recent visual problems, shortness of breath, chest pain, and headache. Plaintiff reported a history of smoking a pack of cigarettes per day for ten years but said he quit 15 years ago. He reported a history of cocaine use for 10 years but said he quit 15 years ago. He continued to use marijuana occasionally. His blood pressure was 151/99. He weighed 262 pounds. On exam he was noted to have a nodule on his left knee causing pain and a reduced range of motion (45°), restricted by pain. "Has severe OSA [obstructive sleep apnea] but has not been using his CPAP machine due to cost. Sleep clinic states in their note that they are working with the manufacturers to decrease the cost for him. Stressed importance of using his CPAP machine for his OSA. Could be a factor in patient's uncontrolled hypertension. Has follow up appointment with sleep clinic in 3/11. Stressed importance of keeping appointment and to do everything possible to fund the CPAP machine." X-rays of his knees were ordered, and he was told to continue using Ultracet as needed for pain. His chronic myalgia and muscle spasms were noted to be uncontrolled with unknown etiology, possibly an autoimmune disease. "Previous workup has been unremarkable" although plaintiff had a documented history of elevated creatine kinase. He was referred to rheumatology. He was assessed with bilateral

rotator cuff tears (confirmed through MRI in December 2008), improved. The importance of physical therapy was stressed, and he was referred to orthopedics for his worsening shoulder pain. He was told to continue using Ultracet as needed for this pain. He was assessed with marijuana dependence. "Stressed importance of quitting MJ." He was told to return in one month.

On March 7, 2011, plaintiff was seen at Truman Medical Center complaining of difficulty reading recently, occasional eye redness and excessive tearing (Tr. at 384-387). The records are not legible.

On March 8, 2011, plaintiff had a renal artery Doppler study which was compared to one done in 2005 (Tr. at 382). There was no significant renal artery stenosis (narrowing) shown.

On March 23, 2011, plaintiff was seen at Truman Medical Center for a knot on the bottom of his right foot (Tr. at 380-381). Plaintiff denied headaches or neck pain. Muscle strength was 5/5 bilaterally. No knots were noted on either foot, but plaintiff had a callus on his right foot. The callus was removed.

On June 23, 2011, plaintiff was seen at Truman Medical Center Sleep Clinic (Tr. at 505-511, 626-627). His blood pressure was 115/80. In a review of symptoms, plaintiff reported pain in his knees, lower back, neck, and shoulders which he rated an 8/10. Alleviating factor was "getting off of it." Aggravating factors were palpation and standing. "He got his CPAP four months ago and is using it every night, but he takes it off during the middle of the night. He wakes up nearly all the nights with his machine beside him." Plaintiff continued to smoke marijuana. He reported having smoked two packs of cigarettes per day from age 15 to age 30. He weighed 256 pounds. Plaintiff was assessed with severe obstructive apnea. "Compliance is questionable. He is using the machine every night, but takes it off in

22

the middle of the night. He is not sure how many hours he is using it, occasionally feels more awake and alert, occasionally he does not. He has chip that he will send to Provider Plus to download. . . . We will see how much he is using the machine and we encouraged him to use it as much as he can." Plaintiff was counseled on weight loss with diet and exercise. He was assessed with marijuana abuse and was counseled about quitting.

On December 23, 2011, plaintiff was seen at Truman Medical Center "for evaluation following 10 months of not coming to clinic." (Tr. at 620-625). He had been out of his blood pressure medications for six weeks. "Patient appears to have a history of non-adherence." Plaintiff's blood pressure was 158/111 and plaintiff said that was low compared to usual. Plaintiff said his shoulder pain was not improved with Ultracet. He "can't afford rehab -- not interested in Sx. Would like pain meds and home rehab info." Plaintiff reported a mass on his right mandible and displaced lower right molar. "Patient states that he can't afford dental visit." Plaintiff reported having smoked a pack of cigarettes a day for ten years but quit 15 years ago. He reported no alcohol use but said he had a history of cocaine use for 10 years but has not used it in 15 years. He said he occasionally smokes marijuana. He weighed 272 pounds. Plaintiff's hypertension was assessed as uncontrolled but asymptomatic. His Norvasc was refilled and he was told to take Accuretic and Toprol XL as directed. "Not changing meds today as patient not seen for 10 months. Need to see labs and what patient's blood pressure looks like on ALL meds. Return in 1 month." With regard to his bilateral rotator cuff tears, "stressed importance of physical therapy." He was told to continue taking Ultracet as needed for pain and Ibuprofen was also recommended. With regard to his obstructive sleep apnea, plaintiff said he could not keep his CPAP on all night. "Stressed importance of using his CPAP machine for his obstructive sleep apnea. Could be a factor in patient's uncontrolled

23

hypertension." His knee pain was described as controlled. "Stressed importance of quitting marijuana."

On January 17, 2012, plaintiff was evaluated by Kala Danushkodi, M.D., who is board certified in physical medicine and rehabilitation (Tr. at 501-503). Dr. Danushkodi examined plaintiff and reviewed his medical records in order to provide a disability evaluation.

HISTORY OF PRESENT ILLNESS: . . . He was hospitalized at Truman Medical Center in 2010 with hypertensive emergency versus urgency. He has a history of noncompliance with blood pressure medications. A CT scan of the head was negative. Cardiac enzymes were negative. Echocardiogram revealed ejection fraction of 45% with moderate left ventricular hypertrophy.[8] Arterial Doppler studies negative. MR angiogram of the head reveal[ed] no significant stenosis or occlusion of intracranial vessels. MRI of the brain negative. He had another hospitalization in February 2011 for complaints of slurred speech and unilateral upper extremity weakness. He has chronic myalgia and recurrent muscle spasms that are uncontrolled, multiple joint pain, and obstructive sleep apnea. He had MRI of the shoulders which revealed partial rotator cuff tear. He has elevated creatine kinase and muscle enzymes. His workup for rheumatoid arthritis was unremarkable, and CK [creatine kinase] elevation was felt to be related to his rotator cuff tear. His EMG and nerve conduction study was within normal limits, and he has a diagnosis of myositis with unknown etiology. Cervical spine x-rays revealed degenerative disk disease at C5 and C6.

The patient complains of constant pain in his neck, shoulders, knees, wrist, and foot. The pain is 9/10 to 10/10, dull aching in nature. He reports inability to sit, stand, or walk for more than 10 to 15 minutes. He reports knee popping and grinding. Periodically, his arms and feet go numb. Pain is moderately relieved with rest.

TYPICAL DAILY ACTIVITIES: He is predominately sedentary and has difficulty performing his homemaking. He is independent in ADLs [activities of daily living] and mobility and ambulates without assistive device.

\* \* \* \* \*

---

[8]"Left ventricular hypertrophy is enlargement (hypertrophy) of the muscle tissue that makes up the wall of your heart's main pumping chamber (left ventricle). Left ventricular hypertrophy develops in response to some factor, such as high blood pressure, that requires the left ventricle to work harder. As the workload increases, the walls of the chamber grow thicker, lose elasticity and eventually may fail to pump with as much force as that of a healthy heart. Left ventricular hypertrophy is more common in people who have uncontrolled high blood pressure or other heart problems. Treating high blood pressure can help ease your symptoms and may reverse the left ventricular hypertrophy."
http://www.mayoclinic.org/diseases-conditions/left-ventricular-hypertrophy/basics/definiti on/con-20026690

MEDICATIONS:  Norvasc, Toprol, Accuretic, aspirin, and Ultracet.

* * * * *

SOCIAL HISTORY:  Married.  Has two children.  He denies history of smoking or alcohol.  He smokes marijuana periodically.

* * * * *

PHYSICAL EXAMINATION:  The patient is a moderately obese male.  Blood pressure 183/138.  Height 5'10".  Weight 253 pounds.  His gait is mildly antalgic.  He did not have difficulty getting on and off table. . . .  Cervical spine is stiff with diffuse tenderness of the cervical spinous process.  He has limited cervical range of motion.  Right neck rotation 20 degrees and left neck rotation 30 degrees.  Lateral flexion 30 degrees.  Flexion is normal.  Extension 30 degrees.  He has increased pain with cervical range of motion in all planes.

There is diffuse myofascial tenderness of the cervical paraspinal muscles and lumbosacral paraspinal muscles.

. . . EXTREMITIES:  Revealed arthritic changes consistent with Heberden nodes in both hands. Left wrist deformities and previous dislocation. He has limited range of motion in the left wrist in extension limited by 20 degrees. He is able to make a fist and open his fingers without difficulty.  He has pain with wrist range of motion and finger range of motion . . . .  Range of motion in both shoulders is limited.  Right shoulder limited to 90 degrees abduction and forward flexion and 30 degrees external rotation.  Left shoulder limited to 100 degrees forward flexion and abduction and 30 degrees external rotation. Shoulder joints are tender at the acromioclavicular joint, and he has increased pain with rotator cuff impingement signs. . . .  Grip strength is 20 pounds bilaterally.



Bony bumps on the finger joint closest to the finger nail are called Heberden's nodes. Bony bumps on the middle joint of the finger are known as Bouchard's nodes.

Knees revealed medial joint line tenderness of the left knee with pain aggravated on knee range of motion.  There is positive crepitus[9] on range of motion.

Overall gait is antalgic.  He was unable to heel walk, toe walk, and he refused to squat.

_____

[9]A clinical sign in medicine that is characterized by a peculiar crackling, crinkly, or grating feeling or sound in the joints.  Crepitus in a joint can indicate cartilage wear in the joint space.

25

DIAGNOSTIC IMPRESSION:
1.    Bilateral shoulder rotator cuff dysfunction
2.    Polyarthralgia
3.    Uncontrolled hypertension
4.    Obesity

FUNCTIONAL INFORMATION:  Based on my evaluation and clinical judgment, my opinion is as follows:
1.    I estimate no restrictions to sitting.
2.    I estimate he can stand and walk for up to 4-5 hours with periodic rest breaks. May benefit from using a cane on uneven surfaces.  I estimate he can lift, carry, and handle objects 5 to 10 pounds at the waist level.  He should be restricted with any type of overhead activities or reaching activities due to rotator cuff tear.  There are no restrictions to hearing speaking, traveling, or vision.

On January 19, 2012, Dr. Danushkodi completed a Medical Source Statement (Tr. at 495-500).  She found that plaintiff could lift and carry up to 10 pounds occasionally; sit for 6 to 8 hours per day and for 4 hours at a time; stand for 4 to 5 hours per day and for 2 hours at a time; walk for 4 to 5 hours per day and for 2 hours at a time; would need to use a cane on uneven surfaces; could carry small objects with his free hand while using a cane; occasionally reach overhead, reach in all other directions, handle, finger, feel, push, pull, operate foot controls, climb stairs and ramps, balance, stoop, and kneel; never climb ladders or scaffolds, crouch or crawl.  She found that none of his impairments affect his vision.  She found that he cold occasionally work around moving mechanical parts; operate a motor vehicle; be exposed to humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, and vibrations; never be exposed to unprotected heights; and could have moderate exposure to noise such as that found in an office.  Dr. Danushkodi answered, "yes" to the following questions:  Can plaintiff perform activities like shopping; travel without a companion for assistance; ambulate without using a wheelchair, walker or 2 canes or 2 crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single handrail; prepare a simple meal and feed himself; care for his personal hygiene; sort, handle and use papers and files.

26

On January 27, 2012, plaintiff was seen at Truman Medical Center complaining of chronic muscle cramps for the past four or five years (Tr. at 616-619). Plaintiff said his cramps occur 1 to 3 times per day from 20 minutes up to 4 hours. They are spontaneous, aggravated with activity and sometimes relieved with immobility. "Patient denies any relief with Ultracet or Ibuprofen." Plaintiff also complained about a small mass in his mouth which had been slowly growing for the past year and a half. "Due to financial reasons and inconvenience, he has not seen a dentist in over a year. Pt does have an extensive smoking history but he denies smoking now." Plaintiff complained of poor sleep from his obstructive sleep apnea and "says his CPAP machine is not working." He has to sit up in order to sleep. Plaintiff denied fatigue, blurry vision, chest pain, joint pain, muscle pain, headache. He reported dizziness on occasion. Plaintiff reported continuing to smoke marijuana 2 to 3 times a day for the past 15 years. His blood pressure was 154/98. "Limited 3/5 strength and range of motion in bilateral upper extremities and bilateral lower



extremities. Patient is unable to go beyond 50 degrees with abduction in bilateral upper extremities passively, he is not able to extend his bilateral shoulders. Patient has pain with extension and flexion to bilateral knees." Plaintiff weighed 265 pounds. "Patient has extensive drug abuse history and could have cramps secondary to Hepatitis C virus; will order for hepatitis." His hypertension was considered uncontrolled. His Norvasc and Toprol XL 100 mg were refilled, Accuretic was discontinued and Quinapril was started. Plaintiff was told to use

27

his CPAP. Oral surgery was consulted regarding plaintiff's mouth lesion. The importance of physical therapy for his shoulders was stressed. He was told to discontinue Ultracet and Ibuprofen since he claimed those were not working, and make an appointment with orthopedics.

On January 28, 2012, plaintiff was seen in the emergency room at Truman Medical Center complaining of rapid onset of chest pain beginning about 45 minutes earlier (Tr. at 590-615). He arrived at the hospital by ambulance. Plaintiff had taken aspirin at home and was given more in the ambulance as well as nitrolglycerin. His blood pressure was 117/67. He weighed 265 pounds. He described his chest pain as a 10/10. "Pt is a 48 yo with history of hypertension, obstructive sleep apnea, chronic pain, presenting with mid sternal chest pain that started on the left and migrated to the right. One hour since onset intermittent unrelieved with nitro by EMS. No coronary artery disease history but extensive drug abuse history per records, denies now. Patient grunting in pain. States feels like someone stepping on his chest. Had similar pain in the past but not in his chest as he has a history of muscle spasms for which he takes Ultracet." Plaintiff denied tobacco use, alcohol use and drug use (Tr. at 602). He tested positive for marijuana and opiates (Tr. at 604, 615). "Assessment: He has been asymptomatic for several hours. We did a 2 set trop which is normal and 2nd EKG unchanged." (Tr. at 605). Chest x-rays were normal (Tr. at 605). Plaintiff was given Flexeril, a muscle relaxer, for muscle spasms and told to follow up with his primary care physician. His discharge instructions included the following: "You were seen for chest pain. Your heart work up is unremarkable here but we are arranging follow up with cardiology for you in the next 72 hours. Don't miss this appointment."

On February 3, 2012, plaintiff was seen in the Cardiology Clinic at Truman Medical Center with complaints of chest pain (Tr. at 586-589). His blood pressure was 148/104. He

weighed 267 pounds. Plaintiff described his pain as a 7/10, sometimes occurring with exertion and sometimes at rest, lasting for 30 to 40 minutes, with no aggravating or relieving factors. He also complained of shortness of breath on exertion with moderate exercise with an exercise tolerance of less than one flight of stairs. He denied dizziness. Plaintiff reported that he was a nonsmoker with no alcohol use and no history of drug abuse. He was prescribed Imdur and he was told to increase his Toprol XL to 200 mg per day.

On February 6, 2012, plaintiff saw Robert Kern, DDS, at Truman Medical Center (Tr. at 573-585). Plaintiff complained of a lesion in his lower right jaw, present for over a year. Plaintiff reported smoking marijuana once or twice a day and using alcohol occasionally. He reported having quit smoking cigarettes 20 years ago. His blood pressure was 154/103. X-rays showed chronic severe generalized perio disease with severe bone loss throughout dentition. Dr. Kern took a biopsy of the lesion.

On February 14, 2012, plaintiff had an echocardiogram showing ejection fraction of 50 to 55% (see footnote 7 page 18) (Tr. at 563).

On February 17, 2012, plaintiff had a follow up with Cardiology at Truman Medical Center for clearance for oral surgery (Tr. at 569-572). Plaintiff described having chest pain which he rated a 7/10 in intensity, occurs sometimes with exertion and sometimes also at rest, lasting about 30 to 40 minutes. "No other aggravating or relieving factors." He also complained of shortness of breath with moderate exercise. "Exercise tolerance is <1 flight of stairs." He denied dizziness. Plaintiff reported no history of drug abuse. His echocardiogram showed ejection fraction of 50% with no valve abnormalities. His hypertension was described as uncontrolled and Hydralazine, 50 mg three times a day, was added to his medications. He was cleared for anesthesia.

On February 20, 2012, plaintiff saw Robert Kern, DDS, at Truman Medical Center to get the results of his biopsy (Tr. at 529-532, 565). He continued to use marijuana. His blood pressure was 145/98. His assessment was mandibular lesion, benign neoplasm suspected, and chronic advanced generalized periodontal disease. He was scheduled for excision of the mass as well as removal of his teeth.

On February 24, 2012, plaintiff was seen at Truman Medical Center for a follow up on chronic muscle cramps for the past four to five years (Tr. at 556-568). Plaintiff said his cramps are aggravated with activity, sometimes relieved with immobility. "Pt. is only taking Ultracet for this pain which has some relief." With regard to his obstructive sleep apnea, plaintiff reported sleeping in a sitting up position to alleviate pressure. He reported compliance with all medications. He denied blurry vision. He continued to use marijuana two to three times a day for the past 15 to 20 years. His blood pressure was 150/100. Strength was 3/5 in both arms and legs. "Pt has pain with extension and flexion to bilateral knees." He weighed 269 pounds. His Hydralazine was increased to better manage his hypertension.

On February 29, 2012, plaintiff underwent surgery with general anesthesia to remove a right manidbular soft tissue mass and removal of his remaining 19 teeth (Tr. at 533-555). His blood pressure was 165/106. He weighed 267 pounds. When he was discharged later that day he was instructed to participate in activity as tolerated with no lifting, he was to avoid driving, avoid alcohol, avoid nonprescription drugs, avoid power tools.

On March 2, 2012, plaintiff was seen in the Sleep Clinic at Truman Medical Center for a follow up (Tr. at 524-527). "I haven't been using my machine the past few days." Plaintiff said that he sometimes "unconsciously" removes his CPAP during the night. He had been getting about 6 hours of sleep a night and thought he was able to keep the CPAP on for about 4 hours every night. He had not been using his CPAP since his oral surgery due to pain. Plaintiff

30

reported no shortness of breath, no chest pain, "no decreased exercise tolerance," no muscle weakness, no headache, no hallucinations. Plaintiff continued to smoke marijuana. His blood pressure was 148/108, he weighed 263 pounds. Musculoskeletal exam showed normal range of motion (Tr. at 526). "He did not bring in his smart card today. I will have staff from the sleep lab contact his DME company (provider plus) to get a recent compliance download. I discussed with patient the health ramifications of untreated sleep apnea and instructed him to use his machine every night and throughout sleep." Plaintiff was counseled on the importance of weight loss. "He reports that he is unable to exercise due to his muscle disease. He did report watching his diet."

On March 20, 2012, plaintiff was seen in the General Surgery Clinic at Truman Medical Center due to complaints of muscle cramps for nearly three years (Tr. at 520-523). "This pain is debilitating at times, and it has stopped him from being an active/working [person]. . . . Muscle relaxers help, however, he does not like to take them because the medication makes him drowsy. When pain is severe, patient takes Ultracet." Plaintiff was using marijuana daily. His blood pressure was 138/89. On exam he had normal range of motion and normal strength (Tr. at 522). Plaintiff was to be scheduled for a muscle biopsy.

On March 26, 2012, plaintiff was seen by Robert Kern, DDS, at Truman Medical Center for a follow up on his oral surgery (Tr. at 518-519). He was having no pain and was informed that the right cheek mass that had been removed was a benign fibroma. Plaintiff said he would be working on getting his dentures in about four weeks.

On March 30, 2012, plaintiff was seen at Truman Medical Center for a follow up on chronic pain (Tr. at 515-517). Plaintiff rated his leg and shoulder pain a 9/10 "which only rest can help. Pt states he is unable to work and play baseball with his son due to the pain and cramping. Pt was given Ultracet but states he doesn't take it because it doesn't help." Instead,

Case 4:13-cv-01185-REL   Document 13   Filed 03/03/15   Page 31 of 54

plaintiff said he was smoking three marijuana cigarettes per day for pain. He uses alcohol occasionally. Plaintiff reported feeling weak, but he denied shortness of breath and chest pain. He reported headaches three times daily. On exam plaintiff's strength was decreased in his extremities and "can not raise arms due to pain." Plaintiff was assessed with chronic cramps/myalgia and it was noted that he was scheduled for a muscle biopsy on April 9. He was prescribed Neurontin. His hypertension was noted to be uncontrolled - it was 154/114.

On April 12, 2012, the final report on plaintiff's four muscle biopsies was prepared by Nebraska Medical Center where the samples had been sent (Tr. at 628-635). The results were "slight atrophy." "There is no regeneration, necrosis, inflammation, or fibrosis."

## C.    SUMMARY OF TESTIMONY

During the September 10, 2012, hearing, plaintiff testified; and Janice Hastert, a vocational expert, testified at the request of the ALJ.

## 1.    Plaintiff's testimony.

Plaintiff has a high school education and he went to ITT Technical Institute for a year (Tr. at 41). He is a certified nurse's assistant, and completed his training in 2004 (Tr. at 41, 210). Plaintiff can no longer do the work of a certified nurse's assistant because he has cramps and headaches, and he is unable to lift people due to his shoulders (Tr. at 42). When he was giving someone a shower, he had to be pulled out of the shower and taken to the hospital in an ambulance due to muscle spasms and cramps (Tr. at 42). The cramps and spasms are in his arms, his sides, his chest and his legs (Tr. at 44). His whole body will "cramp up" (Tr. at 44). It happens all the time (Tr. at 44).

Back in 2008 (plaintiff's alleged onset date is June 1, 2008), plaintiff was throwing up a lot in the mornings (Tr. at 45). He later found out he has had a stomach bug for the last eight or nine years (Tr. at 45). He has been taking antibiotics for that and "it has been working" (Tr.

32

at 45). Plaintiff also has hypertension that keeps getting him fired from jobs (Tr. at 45). He was working as a certified nurse assistant and every time they would take his blood pressure and it would be high, they would send him home and tell him he could not work because he was prone to a stroke (Tr. at 46). This was when he was compliant with his medication (Tr. at 46). Despite the hospital records saying he was noncompliant, plaintiff testified that his wife make sure he takes his medication "no matter what. Religiously" (Tr. at 46). Plaintiff continues to take his medication as directed, and his blood pressure runs high, many times it gets as high as 180/120 (Tr. at 46).

Plaintiff first applied for disability benefits in August 2008 (Tr. at 57). His application was denied in November 2008, and he waited until 2011 to reapply (Tr. at 57). Plaintiff said he never got notice that his application had been denied, and he finally called and was told that he had been denied and he would be getting an appeal letter, but he never got an appeal letter (Tr. at 57-58).

Plaintiff has had problems with his shoulder for years (Tr. at 47). He had trouble lifting patients, and he would wake up in the morning and would be unable to use his arms (Tr. at 47). He finally went to the doctor and was told that both of his shoulders were separated (Tr. at 47). Plaintiff was sent to a physical therapist, but he did not go because it was $15 per visit (Tr. at 48). So he has not had any treatment for his shoulders other than taking Ultracet (Tr. at 48, 50). Plaintiff does not lift much, and he has his wife gets things out of cabinets for him (Tr. at 48-49). His right shoulder is worse than the left (Tr. at 49). He has to have his wife wash his hair and his back (Tr. at 49). He can wash his body from his chest down (Tr. at 49). Plaintiff's wife shaves him (Tr. at 49). His wife used to help him brush his teeth, but he no longer has teeth (Tr. at 49-50). He had to have all of his teeth removed so the doctor could remove a cyst from his mouth (Tr. at 50).

33

At the time of the hearing, plaintiff was living in an apartment with his wife and two children, ages 7 and 4 (Tr. at 39-40). He was in the U.S. Marines for 3 years and the U.S. Army for 2 years (Tr. at 40). While in the military, plaintiff was in a truck accident and sustained a dislocated bone in his left wrist (Tr. at 40). He had seven pins in his wrist (Tr. at 40). He was in traction with his arm and shoulder for 5 or 6 weeks (Tr. at 40). He thinks he also hurt his knees (Tr. at 40).

Plaintiff cannot open his left hand completely due to the wrist injury (Tr. at 41). He could not do pushups until he had "all the pins and everything" removed (Tr. at 41). His left hand gets stiff and swells up a lot (Tr. at 41). Plaintiff is right handed (Tr. at 41).

Plaintiff "used to be a crack head" but he has not used cocaine in over 12 years (Tr. at 42). He uses marijuana currently, it helps relax his muscles when he starts to cramp and he uses it for headaches (Tr. at 42). Plaintiff has to lie down whenever het gets a headache or has back pain, muscle spasms or cramps (Tr. at 50). He is unable to stand up or move, so he lies down and tells everyone to leave him alone (Tr. at 50).

Plaintiff drives very little, "maybe to the Quick Trip and back" (Tr. at 50). He keeps his hands low on the steering wheel and tries not to move his arms or shoulders very much (Tr. at 51). Plaintiff can walk to his son's school about twice a week, but he walks very slowly, uses a cane, and stops a lot (Tr. at 51). The school is a few blocks from his home (Tr. at 51). Plaintiff's wife drops the child off at school in the morning, and if plaintiff cannot walk to pick him up, he calls his sister-in-law who goes to get him (Tr. at 53). Plaintiff is only able to go get his son about twice a week because of muscle cramps, bad arthritis in his knees and ankles, and headaches which are exacerbated by bright light (Tr. at 53).

Plaintiff's cane was not prescribed, but plaintiff uses it for his legs, knees and ankles (Tr. at 51-52). He has used it for about four years (Tr. at 52). Plaintiff did not have a cane with

him when he saw a consultative examiner in January 2012, and he did not bring a cane to the administrative hearing (Tr. at 52). His wife drove him to the hearing and he leaned on his wife because he did not have his cane (Tr. at 53).

Plaintiff's headaches are related to his hypertension (Tr. at 53). The headaches are always there but sometimes they are really bad (Tr. at 53). Plaintiff's pain during the administrative hearing was rated as a 4 on a scale of 1 to 10 (Tr. at 54). He takes Tylenol and Ibuprofen for his headaches (Tr. at 54). Plaintiff's headaches are too bad for him to go pick up his son about 10 to 15 times out of the month (Tr. at 54). On those days his headache pain is an 8 or a 9 on a scale of 1 to 10 (Tr. at 55). When it gets to a 10, he goes to the emergency room (Tr. at 55). Plaintiff's worst pain comes from cramps and muscle spasms (Tr. at 56). That pain gets worse than a 10 on a scale of 1 to 10 (Tr. at 56). His pain feels like he is having a heart attack -- like someone is stepping on his chest and trying to pull his arms up at the same time (Tr. at 56).

Plaintiff uses a CPAP machine for his sleep apnea (Tr. at 55). He has a hard time with it (Tr. at 55). "I usually take it off during the night. I lay on the side and I take my hand and just flick it off my face. I don't know, I just wake up during the night and it's off usually in the morning." (Tr. at 55). Plaintiff continues to struggle with daytime sleepiness (Tr. at 56-57). He falls asleep during the day five or six times for about 45 minutes each time (Tr. at 57).

## 2. Vocational expert testimony.

Vocational expert Janice Hastert testified at the request of the Administrative Law Judge. The first hypothetical was based on the findings of Kala Danushkodi, M.D., and involved a person who could lift and carry 10 pounds occasionally and less than 10 pounds frequently; stand and walk for four hours per day; sit for six hours per day; occasionally push and pull; could not use ladders or scaffolds, crouch or crawl; could occasionally climb ramps and stairs,

balance, stoop and kneel; could have no exposure to unprotected heights; could have occasional contact with moving mechanical parts, operate a motor vehicle, and be exposed to temperature extremes, humidity, vibrations, and pulmonary or inhaled irritants; could work around moderate levels of noise; could do no overhead reaching and only occasional reaching with the upper extremities (Tr. at 59). Such a person could not perform plaintiff's past relevant work but the person could work as a surveillance systems monitor, DOT 379.367-010, with 350 in Missouri and 25,000 in the country; a semiconductor bonder, DOT 726.685-066, with 820 in Missouri and 66,500 in the country; or a credit checker, DOT 237.367-010, with 170 in Missouri and 24,000 in the country (Tr. at 60). The surveillance systems monitor job requires "less than occasional" reaching (Tr. at 61). The other two jobs require occasional reaching (Tr. at 62).

The second hypothetical was the same as the first except the person could only occasionally grip or grasp with the left non-dominant hand (Tr. at 60-61). The vocational expert testified that adding such a restriction would not have a significant impact on the available jobs since "none of these jobs would have the use of hand tools or pliers, twisting things, so that would have little or no impact on these occupations." (Tr. at 61).

The third hypothetical incorporated all of plaintiff's subjective complaints set out during the hearing (Tr. at 61). Such a person could not work because of the difficulty using upper extremities for work functions and attendance issues that would preclude full time competitive employment (Tr. at 61).

If someone was off task 20% of the day due to pain, these jobs could not be done (Tr. at 61-62). If someone were to doze off occasionally at work, that would be unacceptable (Tr. at 63).

36

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Michael Cominsky entered his opinion on October 12, 2012 (Tr. at 17-28). Plaintiff's last insured date was March 31, 2013 (Tr. at 19).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 19).

Step two. Plaintiff has the following severe impairments: hypertension, sleep apnea, degenerative joint disease of the cervical spine and left knee, osteoarthritis, and bilateral shoulder tendon dysfunction (Tr. at 19). Plaintiff's substance abuse is a nonsevere impairment (Tr. at 20).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 20).

Step four. Plaintiff retains the residual functional capacity to perform sedentary work. He can lift and carry 10 pounds occasionally and less than 10 pounds frequently; push or pull 10 pounds occasionally; stand or walk for four hours per day; sit for 6 hours per day; occasionally climb, balance, stoop, kneel, climb ramps and stairs, and grip or grasp with the left hand; never crouch, crawl or climb ladders and scaffolds; occasionally reach; never reach overhead; have no exposure to temperature extremes, humidity, or unprotected heights; have exposure to moderate levels of noise; have occasional exposure to moving mechanical parts; occasionally operate a motor vehicle; and have occasional exposure to vibration and pulmonary or inhaled irritants (Tr. at 20). With this residual functional capacity, plaintiff cannot perform any past relevant work (Tr. at 26).

Step five. Plaintiff is capable of performing other work, including surveillance system monitor, semiconductor bonder, and credit checker, all available in significant numbers (Tr. at 27). Therefore, he is not disabled (Tr. at 27).

37

## VI.   CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible. Plaintiff argues that the ALJ improperly relied on the fact that plaintiff's earnings record "lent no more than minimal support to his credibility" and did not consider that plaintiff uses marijuana for relief of muscle cramps and headaches. Plaintiff claims his noncompliance was due to his lack of money to buy his medications and inadvertently taking off his CPAP machine or taking it off due to dental disease. Plaintiff argues that had the ALJ analyzed plaintiff's credibility according to the regulations, he would have found plaintiff's statements "fully supported by the evidence."

### A.   CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work

record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.   Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are very thorough and include the following:

> In finding the claimant less than fully credible in regard to his inability to perform full time work, the undersigned considered the following factors used to evaluate symptoms including pain as set forth in 20 CFR 404.1529:
>
> (1)    Claimant's daily activities;
> (2)    The location, duration, frequency, and intensity of claimant's pain or other symptoms;
> (3)    Precipitating and aggravating factors;
> (4)    The type, dosage, and effects of medication, if any;
> (5)    Treatment received for relief of smptoms including pain, if any;
> (6)    Additional measures, if any, used to relieve pain or other symptoms; and
> (7)    Other factors including vacations or travel, caring for others at home, overuse of prescribed drugs, lack of treatment, job searches and history of past jobs, and hobbies.
>
> In finding the claimant less than fully credible, the undersigned also considered testimony and function reports about his activities of daily living that included on March 5, 2011, living in a house with his wife and children managing personal care without problems; caring for his children that included getting them ready for school; caring for a pet; preparing daily meals jointly with his spouse; performing light household chores daily including cleaning, washing dishes, laundering, and vacuuming; traveling daily and independently by driving a vehicle and taking his wife to work and children to school; shopping twice weekly; managing money by paying bills, counting change, and using a checkbook or money orders; and spending time by

39

playing cards and board games with his wife and children. By January 27, 2012, when interviewed by Dr. Danushkodi during the consultative physical evaluation, the claimant reported that he was predominantly sedentary with some difficulty in performing homemaking chores but was able to ambulate without assistive device and independent in his daily activities.

At the hearing on September 10, 2012, the claimant testified that although he has some difficulty shaving, washing his hair, bathing, and has continuing pain, muscle spasms, headaches, and erratic sleep, he continues to drive occasionally to go shopping and walks his son to and from school at least twice a week.

The undersigned also considered the claimant's work history . . . and finds that it lends some support to the credibility of his statements about the inability to work full-time. Based on the claimant's cumulative earnings record showing SGA level earnings during seven of the 15 years prior to the amended date of alleged onset, June 1, 2008, the undersigned finds that the earnings history by itself would . . . only partially support the credibility of his statements about the inability to perform full-time work. . . . Work history evidence also indicates that the claimant had frequent job changes having worked as a certified nurse assistant for at least six employers during the period from December 2002 through March 2008. As a result, the undersigned finds that the claimant's work history does not lend more than minimal support to the credibility of his statements about the inability to work full-time at the range of capacity expressed above.

The undersigned also considered precipitating and aggravating factors in assessing the claimant's credibility . . . and finds that his substance use and failure to comply in taking medications as prescribed lends less than partial support to the credibility of his statements about the inability to work full-time. From the evidence, the undersigned finds that the claimant is less than credible since he has a history of cocaine use, frequent daily use of marijuana, and occasionally forgets to take or runs out of medications used to relieve his blood pressure and other symptoms. In making this finding, the undersigned also considered claimant's noncompliance in using his CPAP machine based on his testimony that it is occasionally turned off during the night. . . .

In terms of the intensity, persistence, and limiting effects of the claimant's symptoms associated with hypertension, sleep apnea, degenerative joint disease, osteoarthritis, and bilateral shoulder tendon dysfunction, the undersigned found that the severity of the claimant's alleged symptoms [is] not supported by objective medical evidence from treating, examining, and reviewing sources. . . .

The undersigned found that the severity of the claimant's physical symptoms is generally but not fully supported by objective medical evidence from . . . Truman Medical Center . . . who provided care for the claimant from June 2008 through April 2012. A review of medical evidence indicates that the claimant was hospitalized at TMC in June 2008 for high blood pressure of 190/137 because he had not taken medication as prescribed for six months. The record shows that his blood pressure was under control when he was taking medication as prescribed.

40

The claimant was again hospitalized at TMC in 2010 for a hypertensive emergency associated with a history of noncompliance with blood pressure medications. The record does not show any evidence that the claimant attempted to refill prescription medications by telephone. Results from a CT scan of the head were negative. While results of an echocardiogram on September 7, 2010, revealed moderate left ventricular hypertrophy with an ejection fraction of 45 percent, cardiac enzymes were negative as were results from arterial Doppler studies. Similarly, MRIs of the brain were negative while a magnetic resonance angiogram of the head revealed no significant stenosis or occlusion of intracranial vessels. . . .

While results from a sleep study conducted in August and September 2010 diagnosed the claimant as suffering severe obstructive sleep apnea with prescribed use of a CPAP machine, the claimant's symptoms surfaced again by March 2012 when it was discovered during a follow-up examination that the claimant was noncompliant in using his machine overnight and during periods of dental pain. As a result, clinical sources concluded that the claimant's symptoms were asymptomatic and did not require treatment. Therefore, the severity of the claimant's symptoms associated with sleep apnea is not supported by objective medical evidence to the extent that they would restrict his capacity to work full time. . . .

More recently, the severity of the claimant's symptoms associated with muscle cramps aggravated by activities, is not supported by muscle biopsies taken on April 9, 2012, from his left quadriceps and left triceps. Surgical pathology results from the Nebraska Medical Center . . . revealed that the claimant was suffering slight atrophy. . . .

. . . [O]n January 27, 2012. . . the claimant was able to make a fist and open his fingers without difficulty. . . .

(Tr. at 21-24).

1.    *PRIOR WORK RECORD*

Plaintiff argues that the ALJ's credibility analysis is improper because plaintiff's "earnings record in fact reflects 25 years of solid earnings from the time Plaintiff was 18 years old through his alleged onset date." (plaintiff's brief, page 25). Those "solid earnings" include 13 years during which plaintiff earned less than $5,000 per year. In only 6 years of his life has plaintiff earned more than $10,000 annually, and his annual earnings have never reached $15,000. In 1997 -- 11 years before his alleged onset date -- plaintiff earned $2,388.78. Even at minimum wage, that comes up to less than 13 weeks of full-time work that year. In 2005, which was three years before his alleged onset date and after he became a CNA, plaintiff

41

earned $8,201.17. Even at minimum wage, that comes up to less than 40 weeks of full-time work during that calendar year. In 2007, he earned $3,938.38. Missouri's minimum wage that year was $6.50 per hour, meaning plaintiff worked less than 16 weeks full time that year. If plaintiff was paid more than minimum wage at any of these jobs, then that would mean he worked even less than the figures set out above.

In addition to the many years of less-than-full-time earnings prior to plaintiff's alleged onset date, I note that plaintiff has a history of short spans of employment with each employer. During the nine years between 2000 and 2008, plaintiff worked for a total of 21 different employers. Although plaintiff argues in his brief that he changed jobs after he became a CNA because of "his conscientious efforts to find and maintain employment in his area of expertise when he was able to sustain work" (plaintiff's brief, p. 25), there is little evidence of why plaintiff left each job[10] and no evidence of how much time he spent unemployed between jobs. In addition, the many employers in his work history spans well beyond his "area of expertise" since he did not become a CNA until 2004. Plaintiff does not allege that he was disabled during those years prior to 2008 when he was job-hopping and earning less than SGA amounts.

The ALJ pointed out that plaintiff had earnings at the substantial gainful activity level in only 7 of the 15 years before his alleged onset and that he changed jobs frequently prior to alleging disability. These are appropriate factors for the ALJ to consider in analyzing a claimant's credibility. Gonzales v Barnhart, 465 F.3d 890, 895 (8th Cir. 2006) (ALJ properly

---

[10]Plaintiff testified that when he was a CNA, they would take his blood pressure, it would be high, and he would be sent home because he was prone to a stroke. However, this does not explain the frequent job changes for years before plaintiff became a CNA and started having his blood pressure taken while he was at work.

considered claimant's erratic work history, which included multiple jobs held for only very short periods of time, in assessing credibility).

## 2.    DAILY ACTIVITIES

The evidence of plaintiff's daily activities essentially comes from his administrative paperwork and his administrative hearing testimony.  He did not return his Daily Activities Questionnaire.

On March 5, 2011, plaintiff reported that he helps get his kids ready in the morning, he drives his wife to work, he drives his kids to school and day care, he does some housework, he picks his family up from work/school/day care at the end of the day, he helps his wife with dinner, he cooks daily and his ability to cook has not changed as a result of his impairments, he cleans, he feeds his dog and takes him outside, he has no problem dressing or bathing, he has no problem shaving or caring for his hair, he has no problem with any aspect of personal care, he does dishes, he vacuums, he does light laundry, he shops for 30 to 60 minutes at a time twice a week, and he plays cards and board games.

On April 26, 2011 -- less than two months later -- plaintiff reported that his wife has to shave him, his wife has to cut his hair, his wife has to help him get in and out of the shower, he has to lean against the shower wall to wash himself, he has difficulty putting on pants, and he cannot fasten buttons.

The only medical record from March 5, 2011, through April 26, 2011 -- when plaintiff's ability to do things significantly declined according to his reports -- was on March 23, 2011, when he was seen at Truman Medical Center for a knot on the bottom of his right foot.  Plaintiff denied headaches or neck pain, muscle strength was 5/5 bilaterally, no knots were noted on either foot, but plaintiff had a callus on his right foot.  The callus was removed. Therefore, according to the medical records, there is no basis for this drastic decline in his

Case 4:13-cv-01185-REL   Document 13   Filed 03/03/15   Page 43 of 54

ability to perform activities of daily living during that 52-day period. The record of plaintiff's daily activities does not support his credibility. The ALJ properly relied on plaintiff's daily activities as reported in his administrative paperwork. Buckner v. Astrue, 646 F.3d 549, 558-559 (8th Cir. 2011) (ALJ properly relied on claimant's description of daily activities in disability questionnaire when assessing credibility).

Finally, I note that on July 1, 2010 -- two years after his alleged onset date -- plaintiff refused to stay in the clinic for a second blood pressure reading, saying, "I have too many things to do today."

3. *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

The medical records establish that plaintiff's treating doctors did not find credible plaintiff's reports of unbearable pain. On November 12, 2008, he reported shoulder pain and muscle cramps of such severity that they precluded him from working. X-rays were normal. He was told to take over-the-counter Tylenol and participate in physical therapy. On December 24, 2008, he was again told to use Tylenol and participate in physical therapy for his allegedly disabling pain. On August 23, 2010, more than two years after his alleged onset date, strength in both arms was normal at 5/5. The following month strength was normal in both arms and both legs. On February 16, 2011, he visited the orthopedic clinic and rated his knee pain a 7/10 and said it frequently goes to a 9/10; however, the record reflects that the medical provider described plaintiff's chronic myalgias and cramping as "stable." On January 17, 2012, plaintiff described his neck, shoulder, knee, wrist and foot pain as a 9/10 or a 10/10, yet he was only taking Ultracet as needed for pain and reported being independent in activities of daily living despite that "worst pain imaginable." On January 28, 2012, he described his chest pain as a 10/10, but extensive testing was all normal and he was given a muscle relaxer. On March 20, 2012, he said that his muscle cramps were debilitating and

44

have stopped him from being a working person. He said muscle relaxers help but he doesn't take them because they make him drowsy, apparently preferring to suffer debilitating muscle cramps rather than feel drowsy.

This factor does not support plaintiff's credibility.

**4.  *PRECIPITATING AND AGGRAVATING FACTORS***

As the ALJ discussed at length, precipitating and aggravating factors are almost exclusively related to noncompliance.

On June 24, 2008, plaintiff went to the hospital due to high blood pressure. He had not been taking three of his four medications for six months. His blood pressure improved by the next day with administration of his blood pressure medications. On October 15, 2008, he had been out of his medications for a month. On December 24, 2008, he said he was unable to get three of his four medications. On June 29, 2010, he had not seen a doctor in over a year and was out of his blood pressure medications. On August 23, 2010, he had been out of his medications for a week. On September 5, 2010, he had not been taking his blood pressure medication for 3 weeks. On September 23, 2011, he had not taken his blood pressure medication because he ran out. On December 23, 2011, he had been out of his blood pressure medication for 6 weeks.

Despite the disabling pain he allegedly experiences from his shoulders, there is no evidence that plaintiff ever complied with his doctors' treatment recommendations. On December 24, 2008, plaintiff said he had not gone to physical therapy due to time conflicts. On June 11, 2009, he said he went to physical therapy twice but it hurt too much. On August 2, 2010, he said he went to physical therapy once but he thought $15 a visit was too expensive. On February 16, 2011, he said he did not participate in physical therapy because of the cost. There is no record of plaintiff ever having gone to physical therapy. His doctors stressed the

45

importance of physical therapy, and told plaintiff that his shoulder pain would never improve and would likely get worse without physical therapy, on May 13, 2009; June 11, 2009; August 2, 2010; February 16, 2011; February 23, 2011; December 23, 2011; and January 27, 2012.

Plaintiff was told by doctors that his obesity was contributing to his obstructive sleep apnea, and that his obstructive sleep apnea was contributing to his uncontrolled hypertension. He was told to lose weight through diet and exercise on December 24, 2008; June 30, 2010; July 14, 2010; August 23, 2010; September 5, 2010; September 15, 2010; November 20, 2010; June 23, 2011; and March 2, 2012. Plaintiff stated on March 2, 2012, that he cannot exercise due to muscle disease; however, biopsies taken a month later showed no muscle disease. Plaintiff's weight remained stable during all of the years covered in the medical record indicating that he did not comply with treatment recommendations to lose weight.

Because plaintiff's obstructive sleep apnea was likely contributing to his uncontrolled hypertension, he was repeatedly advised of the importance of using his CPAP machine. On February 16, 2011, his doctor stressed the importance of using the CPAP and said to "do everything possible to fund the CPAP machine." Plaintiff did not get the CPAP but he did continue to fund his marijuana habit. On February 23, 2011, he was again advised to "do everything possible to fund the CPAP machine." The importance of using the CPAP was stressed on December 23, 2011; January 27, 2012; and March 2, 2012.

On November 20, 2010, plaintiff said he could not afford to get the CPAP. On December 23, 2011, plaintiff said he could not keep his CPAP on all night (although I note there were no problems observed during his sleep study with him taking the CPAP off in his sleep). On January 27, 2012, he claimed that his CPAP machine was not working. On March 2, 2012, he said he had not been using his CPAP due to oral surgery (which was two days earlier). When plaintiff said he did not know how often he was able to keep the CPAP on, he

46

was told that the chip would tell the doctors how often it had been used, and he was assessed with noncompliance. He failed to bring his CPAP chip with him on a follow-up appointment for sleep apnea.

Finally, plaintiff continued daily use of marijuana during the 5 years covered by this record, despite not being able to afford medical treatment recommended by his doctors and despite being counseled on the health dangers of marijuana use and being told repeatedly by his doctors to stop using marijuana. He was told to stop using marijuana on August 23, 2010; November 20, 2010; February 1, 2011; February 23, 2011; June 23, 2011; and December 23, 2011.

This factor does not support plaintiff's credibility. Additionally, failure to follow a prescribed medical treatment without good cause is a basis for denying benefits. Bernard v. Colvin, 774 F.3d 482, 487 (8th Cir. 2014). Plaintiff's good cause is that he did not have the money to buy the medications he was prescribed, to obtain and use a CPAP, or to participate in physical therapy. This is not "good cause." Truman Medical Center worked with plaintiff and the CPAP manufacturer to get plaintiff medications at a discount price and to reduce the cost of his CPAP. Plaintiff offered many excuses over the years (in addition to lack of funds) for not participating in physical therapy, not using his CPAP, not taking his medications. However, the record reflects that he continued to spend his money on illegal drugs despite being advised not to use them and despite the fact that marijuana use did not help his symptoms, rather than using any of that drug money to pay for medical treatment recommended by his doctors. In addition, plaintiff was told that his obesity was likely contributing to his obstructive sleep apnea which was in turn contributing to his uncontrolled hypertension. Eating less and exercising can be done at no cost, but plaintiff never engaged in any exercise as recommended

47

by his doctors and his weight remained stable for years, indicating that he did not reduce his calorie intake.

## 5. DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

The record reflects that plaintiff failed to comply with treatment recommendations and instead used his own form of treatment. Despite plaintiff's claiming that his leg and shoulder pain was a 9/10 and only rest could help, his doctors repeatedly told him to exercise and participate in physical therapy or his symptoms would continue to worsen. Instead, plaintiff did the opposite and "rested" and used marijuana. However, plaintiff's testimony is that his pain is disabling and prevents him from doing any job, which clearly indicates that plaintiff's choice to do the opposite of what his treatment providers have recommended is contributing to his symptoms. Plaintiff's doctors never prescribed strong pain medication, and the pain medication he was given was to be taken on an as-needed basis only. He was told to take over-the-counter pain medications for most of his symptoms.

## 6. FUNCTIONAL RESTRICTIONS

Plaintiff's medical records show that his main problem was uncontrolled hypertension. Although uncontrolled hypertension creates serious health risks, plaintiff's hypertension was asymptomatic throughout the entire record.

Plaintiff's doctors never restricted plaintiff's physical activities except for immediately following surgery with anesthesia. On June 30, 2010, he was told to increase his physical activity and do aerobic exercise. On November 20, 2010, he was counseled on the importance of exercise. On June 23, 2011, he was told to exercise.

On February 28, 2011, an interviewer with Disability Determinations observed that plaintiff had no difficulty using his hands or writing. On August 23, 2010, plaintiff said he could walk a mile and climb a flight of stairs, albeit with shortness of breath. On January 19,

2012, Dr. Danushkodi found that plaintiff could sit without restriction, stand and walk 4 to 5 hours per day, lift and carry objects up to 10 pounds at waist level, and occasionally reach in all directions including overhead. On September 5, 2010, plaintiff was unable to lift his arms due to chronic rotator cuff issues; however, he continued to drive which requires use of his arms. He testified that he has used a cane for 4 years, but he did not bring one to the hearing and he was never observed to be using a cane at any doctor visit.

B.      CREDIBILITY CONCLUSION

In addition to the above Polaski factors, there is other evidence in the record supporting the ALJ's credibility determination. On September 5, 2010, plaintiff told a triage nurse that he had been taking his blood pressure medications as directed, but he told the doctor that he had not been taking them for the past 3 weeks. On February 16, 2011, he said he cannot pass any physical for employment due to knee pain, but he testified that he could not work because his employers see him as a stroke risk due to his high blood pressure. On January 28, 2012, he denied any history of drug use to the EMTs when going to the hospital by ambulance, but records reflected "extensive drug abuse history" and he tested positive for opiates and marijuana. On February 3, 2012, he denied any history of drug abuse. On February 17, 2012, he reported no history of drug abuse.

On January 27, 2012, plaintiff was told to stop taking Ultracet since he claimed it did not work for him. Yet the following day in the ER he said he takes Ultracet for his pain; the following month he said he takes Ultracet for pain with some relief; the month after that he said he uses Ultracet when his pain is severe; and a week later he said he does not take Ultracet because it doesn't help.

Plaintiff testified that his headaches are too bad for him to go pick up his son 10 to 15 times a month. There are on average 21 school days per month, which means that at least half

49

the time plaintiff's headaches prevent him from walking a few blocks to his son's school, despite plaintiff's using marijuana up to three times a day for headache pain. Plaintiff argued in his brief that he uses marijuana for pain and headaches, yet he simultaneously claims he cannot work due to pain and headaches which is a clear indication that his self-treatment is not treating his symptoms at all, rather he simply chooses to use marijuana regularly.

Plaintiff testified that he had to be pulled out of the shower (while assisting a patient at work) and taken to the hospital in an ambulance due to cramps. The medical records establish that the only time plaintiff went to the hospital from work was due to high blood pressure, not cramps, and there is nothing in the record stating that he had to be pulled from a shower. The only time he went to the hospital in an ambulance was due to chest pain, not cramps, and again there is no indication he had to be pulled from a shower on that occasion.

Plaintiff testified that his wife makes sure he takes his medication "no matter what, religiously." Yet the record shows five years' of noncompliance.

Plaintiff's reports regarding his smoking history varied throughout the record. On June 24, 2008, and October 15, 2008, he said he smoked for 20 years and quit in 1998. On August 23, 2010, and November 20, 2010, he said he smoked 2 packs a day for 15 years. On February 23, 2011, he said he smoked 1 pack a day for 10 years and quit in 1996. On June 23, 2011, he said he smoked 2 packs a day for 15 years. On December 23, 2011, he said he smoked 1 pack a day for 10 years. On January 7, 2012, he denied having ever smoked. On February 6, 2012, he said he quit smoking in 1992.

Based on all of the above, I find that the ALJ properly assessed plaintiff's credibility and that the record supports the ALJ's credibility finding.

50

## VII.    PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in assessing plaintiff's residual functional capacity:

The aforementioned RFC for less than a full range of sedentary work reflects very serious limitations (SSR 96-9p); as hereinafter set out, when an assessed RFC for the full range of sedentary work has been so substantially eroded, a finding of "disabled" is appropriate even for those under 50. Social Security Regulation 20 C.F.R. Part 404, Subpt. P, App. 2 § 201.00(h)(3) (2013); SSR 83-12, which explains "most unskilled sedentary jobs require good use of both hands." . . .

. . . It is obvious that Dr. Danushkodi intended to limit Plaintiff to work only at the waist level and to restriction from both overhead and other reaching activities. Said assessed manipulative and postural restrictions, when considered in combination with [plaintiff's nonsevere] impairments, represent such significant limitations on the ability to perform sedentary unskilled work that effectively all work would be eliminated.

(plaintiff's brief, page 19).

In her medical record, Dr. Danushkodi wrote, "I estimate he can lift, carry, and handle objects 5 to 10 pounds at the waist level. He should be restricted with any type of overhead activities or reaching activities due to rotator cuff tear." Restricted does not mean precluded. In her Residual Functional Capacity Assessment, Dr. Danushkodi specifically found that plaintiff could lift and carry up to 10 pounds occasionally; carry small objects with his free hand while using a cane; occasionally reach overhead; occasionally reach in all other directions; occasionally handle, finger, feel, push, and pull; and was capable of caring for his personal hygiene and sorting, handling and using papers and files.

A claimant's residual functional capacity is the most he can do despite the physical limitations from his impairments. Kemp ex rel. Kemp v. Colvin, 743 F.3d 630, 631 (8th Cir. 2014); 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant's residual functional capacity must be based on all credible evidence. McCoy v. Astrue, 648 F.3d 605, 614 (8th Cir. 2011). "[T]he burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Perks v. Astrue, 687 F.3d 1086, 1092 (8th Cir. 2012).

The ALJ discussed his residual functional capacity assessment at length, going through all of plaintiff's normal test results including x-rays, CT scans, cardiac enzymes, arterial Doppler studies, MRIs, magnetic resonance angiogram of the head, EMGs, nerve conduction studies, and muscle biopsies. Plaintiff's uncontrolled hypertension was consistently asymptomatic, and his obstructive sleep apnea and shoulder pain symptoms could have been improved with compliance. The ALJ discussed the medical records and doctors' opinions, and he assessed plaintiff's credibility. The residual functional capacity assessment is supported by the credible evidence in the record.

## VIII.  HYPOTHETICAL

Plaintiff argues that the ALJ erred in posing an inadequate hypothetical to the vocational expert and relying on the expert's testimony.

> The Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles (DOT) describes 2 of the 3 jobs listed by the VE, credit checker (DOT 237.367-010) and semiconductor bonder (DOT 726.685-066) as occupations which require "handling" (through the use of the upper extremities) on a "frequent" basis, which is defined as from one-third to two-thirds of an 8 hour day, clearly exceeding the ALJ's assessed RFC. The third job identified by the VE of surveillance system monitor (DOT 379.367-010) has a worker function task rating of "7 handling" in relation to things. These descriptions and physical requirements are inconsistent both with Plaintiff's physical abilities and the ALJ's hypothetical question because he is limited in handling, reaching, gripping and grasping on the left from very little to occasionally and never reaching above his shoulders.

(plaintiff's brief, pages 22-23).

Plaintiff's argument relies on the statement in Dr. Danushkodi's medical report that plaintiff should be "restricted with any type of overhead activities or reach activities", as discussed in the preceding section with regard to the residual functional capacity assessment. Again, Dr. Danushkodi said "restricted" not "precluded," and in her Residual Functional Capacity Assessment, she specifically identified what type of restriction she found plaintiff should have with respect to reaching activities and handling activities.

52

During the hearing, the ALJ's hypothetical to the vocational expert included no overhead reaching and only occasional reaching with the upper extremities. The vocational expert provided three jobs that such a person could perform. The next hypothetical added the restriction of only occasionally gripping and grasping with the left non-dominant hand. The vocational expert testified that those jobs could still be performed with that limitation.

The ALJ asked whether the testimony differed from the DOT or the SCO. The vocational expert said,

> The issues that would differ would be those that are not addressed by the DOT such as the time and attendance, staying on task, issues of that nature. I was going to my experience in the placement and evaluation of individuals subsequent to that publication.

> There is no "apparent conflict" between the expert's testimony and the DOT.

A requirement of frequent handling does not necessarily conflict with restrictions of occasional reaching, no overhead reaching, and occasional gripping and grasping with the non-dominant hand. In addition, the surveillance systems monitor position does not require handling. See DOT § 379.367-010.

Plaintiff argues in his reply,

> [T]he DOT descriptions of 2 of the 3 jobs listed by the VE, credit checker (DOT 237.367-010) and semiconductor bonder (DOT 726.685-066), note that these are occupations which require "handling" (through the use of the upper extremities) on a "frequent" basis, which is defined as from one-third to two-thirds of an 8 hour day, clearly exceeding the ALJ's assessed RFC. "Frequent" and "occasional" are separate terms of art with distinct meanings, and whether Plaintiff can handle frequently or occasionally is central to the adjudication. . . . The third job identified by the VE of surveillance system monitor (DOT 379.367-010) has a sixth digit worker function task rating of "7" in relation to things and thus requires "handling" as a fundamental task. As Plaintiff was limited to occasional gripping and grasping on the left and no reaching, the physical requirements and descriptions were inconsistent with his physical abilities and with the second part of the ALJ hypothetical concerning his left hand.

(plaintiff's reply brief, page 5-6).

Plaintiff's argument is based on a flawed reading of the residual functional capacity as assessed by the ALJ. The ALJ limited plaintiff to occasional gripping or grasping with the left hand, occasional reaching, and never reaching overhead. There was no limit placed on plaintiff's ability to grip or grasp with his dominant right hand. Further, plaintiff was not limited by the ALJ to "never reaching" -- he was limited to occasional reaching but never reaching overhead. As a result, plaintiff's argument that the first two jobs require frequent handling is without merit. Plaintiff's argument as to the third job again misstates his gripping and grasping restrictions.

I find that the ALJ properly relied on the testimony of the vocational expert.

## IX.   CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ *Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 3, 2015

54